UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SMALL BUSINESS LENDING, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | 1:18-cv-02712-JMS-TAB |
| *vs.* | ) | |
| | ) | |
| DAVID PACK, | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

Plaintiff Small Business Lending, LLC ("SBL") and Defendant David Pack entered into an independent contractor agreement (the "Agreement") whereby Mr. Pack would perform certain duties related to obtaining customers for SBL. SBL eventually terminated the Agreement, and initiated this litigation to enjoin Mr. Pack from violating certain provisions in the Agreement. The Court denied SBL's Motion for Preliminary Injunction in July 2019, [Filing No. 68], and Mr. Pack then filed a Motion for Summary Judgment, [Filing No. 80]. That motion is now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce

admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." Johnson, 325 F.3d at 898. Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005). Additionally, the following facts are taken from the Court's July 30, 2019 Order, and from facts gleaned during a May 13, 2019 evidentiary hearing on SBL's Motion for a Preliminary Injunction.[1]

### A. SBL's Business Model

SBL is a financial brokerage firm that works with small businesses to assist them with acquiring loans. SBL is owned by Robin Green and conducts business throughout the United States. In order to identify and reach potential leads, SBL purchases data ("Lead Data"), including telephone numbers, and uses an auto-dialer to leave voicemails for business owners. There is nothing secret about prospective borrowers' phone numbers or names as they may be purchased on a non-exclusive basis. The prospective borrowers' telephone numbers go "stale" 30 to 60 days after purchase. Business owners may respond to SBL's message by leaving their telephone number on a voicemail to SBL. SBL will then refer the telephone number to an independent contractor via email.

---

[1] Facts for which no citation to the record is provided were gleaned during the May 13, 2019 evidentiary hearing.

SBL also purchases trigger leads, which are generated when a business' credit is ran. Multiple brokers are able to purchase the trigger leads and they are not, therefore, exclusive to SBL. SBL also uses survey leads, whereby they send business owners a survey and at the end, the survey asks the business owner if he or she is interested in working capital. If so, the business owner can leave his or her contact information, which would then be sent to an independent contractor via email for follow-up.

SBL's independent contractors then gather the required application information from business owners seeking to borrow money. Prospective borrowers fill out an application that includes the prospective borrower's Social Security number, date of birth, and personal address and the business' tax ID number and address. In addition, prospective borrowers must submit six months of bank statements and merchant processing statements. SBL's independent contractors gather and screen the required documents and submit them to Ms. Green. Ms. Green then contacts potential lenders. SBL provides scripts to independent contractors as part of its training program for their interactions with prospective borrowers' employees. In addition, SBL provides independent contractors with a step-by-step outline of the process from the time the independent contractor receives a lead.

### B. The Agreement

On or about April 4, 2018, Mr. Pack and SBL entered into the Agreement. [Filing No. 1-1 at 32.] The Agreement provides, in relevant part:

> This Agreement…is made…by and between Small Business Lending LLC, (the "Company"), located at 7206 Franklin Parke Blvd, Indianapolis, Indiana 46259 in the County of Marion, and David W. Pack (the "Independent Contractor" or "Contractor") located at of (sic) 163 Caroway Ct, Spartanburg, Georgia 29303.

[Filing No. 1-1 at 19.] The Agreement then states that "[t]he Independent Contractor is secured to provide the services described below at the Company's principal place of business as

aforementioned, or from the Contractor's principal place of business, if applicable, as aforementioned." [Filing No. 1-1 at 19.]

The Agreement contains a provision regarding proprietary information, which provides, in part:

> All rights, title and interest of any and all kind of nature whatsoever in and to the Proprietary Information made, written, discussed, developed, secured, obtained or learned by the Independent Contractor during the term of its relationship with the Company or always immediately following termination of that relationship, shall be the sole and exclusive property of the Company for any purpose or use whatsoever as it deems necessary or fit, and shall be disclosed promptly by the Independent Contractor to the Company.

[Filing No. 1-1 at 22.] In the course of Mr. Pack coming on board as an independent contractor, Ms. Green disclosed this portion of the Agreement to Mr. Pack.

The Agreement also contains a non-solicitation clause which provides that the independent contractor shall not solicit or attempt to solicit customers or clients of the company "throughout the duration of this Agreement and for a period of (sic) immediately following the termination of this Agreement." [Filing No. 1-1 at 23.]

The Agreement contains a non-competition provision, which states:

> The Independent Contractor herein agrees not to participate in any activity or action that may be deemed of a competitive nature with any activity of the Company during the course of their relationship and for a period of 2 years after the termination of this Agreement. Therefore, for the purpose of this paragraph, competitive activity thus encompasses forming and/or making plans to form a business entity that may be seen as being competitive with any business of the Company.

> During and after the Contractor's contract period with the Company, in the State of North Carolina, and for a period of 2 years following termination of employment, however caused, the Contractor, or his/her Subcontractors, shall not seek or gain employment with any newly formed business (business formed after termination of this Agreement) that is in competition with the Company, its subsidiaries or affiliates within All States described as United States or within a (sic) All Businesses Within The United States mile radius of the Company and the aforementioned business location.

[Filing No. 1-1 at 23-24.]

The Agreement also provides that the "Independent Contractor is or shall remain open to conducting similar tasks or services for the Company, which may not be listed or described below, or for entities other than the Company and thus holds himself or herself out to the public to be a separate business entity." [Filing No. 1-1 at 19.] Further, regarding the scope of work, the Agreement provides that "the Independent Contractor shall retain sole and absolute discretion in the manner and means for the carrying out of his/her activities and responsibilities contained herein this Agreement," [Filing No. 1-1 at 19], and that the "Independent Contractor shall have full discretion within the Scope of Work," [Filing No. 1-1 at 20].

Regarding documents, the Agreement provides:

Any and all documents, records or books which may be related to the Scope of Work, as set forth herein this Agreement, shall be maintained by the Independent Contractor at the Independent Contractor's principal place of business and open to inspection by the Company during regular working business hours. The documents, records and/or books to which the Company shall be entitled to inspect and receive copies of include, but are not limited to, any and all contract documents, change/purchase orders and work which has been authorized by the Company on existing or any potential projects that are related to this Agreement.

[Filing No. 1-1 at 20.] The Agreement further provides:

Upon the termination of this Agreement, or as per the request of either party, each party shall promptly and immediately deliver to the other party any and all property in its possession or under its care and control belonging to the other party, including but not limited to, proprietary information, customer names and lists, trade secrets, intellectual property, computers, equipment, pass keys, company identification, tools, documents, plans, recordings, software, and all related records and/or accounting/financial information.

[Filing No. 1-1 at 26.] The Agreement also contains a two paragraph non-recruit clause. The first paragraph provides that the independent contractor "shall not throughout the duration of this Agreement and

for a period of 2 year (sic) immediately following the termination of this Agreement, either directly or indirectly, recruit any of the Company's employees, customers, clients or management for the purpose of any outside business." [Filing No. 1-1 at 24.] The second paragraph of the non-recruit clause mirrors verbatim the second paragraph of the non-competition provision. [Filing No. 1-1 at 24.]

### C. Mr. Pack's Engagement With SBL

Mr. Pack began receiving emails containing prospective borrowers' telephone numbers on April 11, 2018. On multiple occasions, Ms. Green discussed Mr. Pack's job duties and performance with him and coached him over the phone. He eventually began asking her about how the business worked. Initially, Mr. Pack aggressively pursued leads, but after a time, Mr. Pack was no longer addressing his leads or sending loan applications to prospective borrowers. Mr. Pack asked Ms. Green whether he could generate his own leads to SBL, but he never provided any. During his employment with SBL, Mr. Pack generated six loans and earned $16,849 in commission.

Mr. Pack generated a loan from ILawn LLC ("ILawn") for equipment financing, but ILawn's initial payment check to SBL bounced. Mr. Pack generated a loan to Shaam Inc. ("Shaam"), but something occurred with the lender and the loan did not go through.

Until March 2019, Mr. Pack's LinkedIn page stated that he started working for Sprout Lending in May 2018 and Commodo Financial in June 2018. Sprout Lending and Commodo Financial are both competitors of SBL. Mr. Pack's LinkedIn page also represented that he worked for SBL until March 2019, which he did not.

Mr. Pack received his last email containing prospective borrowers' telephone numbers on July 2, 2018. The same day, Ms. Green told Mr. Pack to take a week off of work and call her back

on July 9, 2018. However, Mr. Pack did not contact Ms. Green on the 9th. As of July 24, 2018, Ms. Green still had not heard from Mr. Pack and began researching his activities. Ms. Green found that Mr. Pack was soliciting one of SBL's independent contractors, Zebulon Tuck, to leave SBL.

On July 3, 2018, Mr. Pack registered Pack Consulting LLC with the Secretary of State of South Carolina. On July 13, 2018, Mr. Pack registered Commodo, LLC with the Secretary of State of South Carolina. On July 24, 2018, Ms. Green sent Mr. Pack a letter terminating his employment with SBL. Among other things, the letter noted that Mr. Pack breached the "Non-Partnership or Ownership and Business Opportunity Clause" of the Agreement by registering Pack Consulting LLC, and stated that the non-competition provision would be enforced for a period of two years following the termination of the Agreement. Additionally, the letter requested that Mr. Pack return all company property and stated that trade secrets, business plans and procedures, client contact lists, and other confidential information could not be used by Mr. Pack in any way. Mr. Pack did not return all of the applications, the Lead Data, or any prospective client information to Ms. Green. On July 24, 2018, Ms. Green cut off Mr. Pack's access to his SBL email account and his access to SBL's lead system.

### D.  SBL's Complaint

SBL initiated this litigation by filing a Verified Complaint and Request for Preliminary and Permanent Injunctive Relief in Marion Superior Court, [Filing No. 1-1 at 7-17], which Mr. Pack later removed to this Court, [Filing No. 1].  In its Complaint, SBL asserts the following claims against Mr. Pack: (1) preliminary and permanent injunction; (2) breach of contract; (3) breach of fiduciary duties/violation of Indiana Trade Secrets Act ("ITSA"); and (4) unjust enrichment. [Filing No. 1-1 at 11-16.]

### E. SBL's Motion for Preliminary Injunction

SBL filed a Motion for Preliminary Injunction on March 22, 2019, based on the following conduct that it alleges Mr. Pack engaged in:

- After "obtaining access to the SBL program, Mr. Pack immediately began using it so as to facilitate leads for a competitor of SBL" – Sprout Lending;

- In June 2018, Mr. Pack started a website to compete with SBL;

- In July 2018, Mr. Pack started two entities to complete with SBL – Pack Consulting LLC and Commodo, LLC;

- Mr. Pack solicited another SBL representative to quit and work with him; and

- "Mr. Pack has never returned the client applicant/borrower data he acquired while an SBL representative."

[Filing No. 41 at 6.]

SBL sought to preliminarily enjoin Mr. Pack from engaging in five categories of activity: (1) "[p]ossessing or using information provided to him while working for SBL, consisting of proprietary financial or other data"; (2) "[d]isclosing information provided to him while working for [SBL], consisting of proprietary financial data or other data"; (3) "[s]oliciting SBL employees to leave SBL"; (4) "[e]ngaging in the business of financing business loans so as to be competitive with SBL"; and (5) "[h]olding himself out as a representative of SBL, including, but not limited to, on his LinkedIn account." [Filing No. 41 at 7-8.] The Court denied SBL's Motion for Preliminary Injunction, finding that SBL had not shown that: (1) it will suffer irreparable harm before the resolution of its claims in this litigation; (2) traditional legal remedies are inadequate; or (3) it was likely to succeed on the merits. [Filing No. 68 at 16-26.]

Relying upon the Court's denial of SBL's Motion for Preliminary Injunction, Mr. Pack now moves for summary judgment, arguing that "the legal and evidentiary shortcomings that precluded a preliminary injunction remain." [Filing No. 81 at 1.]

# III.
## DISCUSSION

The Court reorganizes the order of the parties' discussion of SBL's claims, and discusses them in turn below.

### A.  Breach of Contract

SBL's breach of contract claim appears to be based on allegations that Mr. Pack failed to return the Lead Data, breached the non-competition provision of the Agreement by working for Sprout Lending, and breached the Agreement by misrepresenting his position on LinkedIn and recruiting Zebulon Tuck.

### 1.  *Failure to Return the Lead Data*

Mr. Pack argues in support of his Motion for Summary Judgment that SBL hinted in its Complaint that Mr. Pack violated the Agreement by failing to return SBL's property, but did not repeat that claim in its answer to Mr. Pack's interrogatory asking him to identify the breaches of contract at issue.  [Filing No. 81 at 5.]  Mr. Pack asserts that even if SBL has not waived its breach of contract claim based on a failure to return SBL property, that claim nevertheless fails because the only property discussed is the Lead Data, and Ms. Green conceded at the hearing on SBL's Motion for Preliminary Injunction that she always had copies of the Lead Data and Mr. Pack had no physical copies.  [Filing No. 81 at 5.]  Mr. Pack contends that although the Agreement did not require Mr. Pack to wipe clean his electronic devices to delete that information, he "remains ready, willing, and able to have a company securely dispose of his laptop hard drive," but "SBL's counsel…continues to object to destroying the hard drive…."  [Filing No. 81 at 6.]  Mr. Pack also argues that SBL, at most, has a non-exclusive license in the Lead Data from a third-party vendor, and has not shown that it owns the Lead Data so as to trigger any contractual rights.  [Filing No.

81 at 6.] Finally, Mr. Pack argues that SBL has not presented any evidence of damages, especially since the Lead Data is stale within 30 to 60 days of its generation.  [Filing No. 81 at 6.]

In its response, SBL does not discuss the Lead Data in connection with its breach of contract claim, focusing on the Lead Data only in connection with its breach of fiduciary duty, ITSA, and injunction claims.  [Filing No. 95 at 2-4.]

Mr. Pack does not address the Lead Data in his reply brief as it relates to the breach of contract claim.

In order to succeed on a breach of contract claim, SBL must show: "the existence of a contract, the defendant's breach thereof, and damages." *Rogier v. Am. Testing & Engineering Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000).  Given SBL's failure to respond to Mr. Pack's arguments regarding the Lead Data in connection with the breach of contract claim, and because the evidence indicates that Ms. Green had a physical copy of the Lead Data in any event and the Lead Data has long become stale, the Court **GRANTS** Mr. Pack's Motion for Summary Judgment on SBL's breach of contract claim to the extent that claim is based on Mr. Pack's alleged retention of the Lead Data.

### 2. *Breach of the Agreement's Non-Competition Provision*

Mr. Pack argues that the non-competition provision only prohibits him from engaging in competing work in North Carolina at a business formed after termination of the Agreement, and that he works in South Carolina at businesses that were formed before the Agreement was terminated. [Filing No. 81 at 7.]  Additionally, Mr. Pack contends that SBL did not have an interest that it was legitimately trying to protect through the non-competition provision and that it "seeks to prohibit contact with SBL customers that Mr. Pack did not even work with during his brief tenure."  [Filing No. 81 at 8.]  Mr. Pack notes that, in any event, the non-competition provision

- 11 -

allows SBL's customers to come to him and does not prohibit him from contacting customers that he did not work with at SBL. [Filing No. 81 at 8.] Mr. Pack also argues that the non-competition provision is not sufficiently reasonable in time and scope, and that SBL has no cognizable damages. [Filing No. 81 at 8-9.]

In response, SBL argues that Mr. Pack actually began working for Sprout Lending one month after he began working for SBL and that "while [he] was going rogue with Sprout Lending, he was using SBL to financially underwrite [his] work to the detriment of SBL." [Filing No. 95 at 4-5.] SBL also argues that rescission of the Agreement would be appropriate, and that Mr. Pack should return the $16,849 SBL paid to him. [Filing No. 95 at 6-7.]

In his reply, Mr. Pack argues that even if SBL can establish that he began working for Sprout Lending before August 2018, it has not identified any provision of the Agreement that this violated. [Filing No. 96 at 5.] Mr. Pack reiterates his argument that SBL has not shown that it has suffered any damages, and argues that SBL cannot claim now – for the first time in this litigation – that rescission is appropriate and that it is entitled to a return of the amounts it has paid Mr. Pack. [Filing No. 96 at 6-7.] He also argues that SBL relied upon the Agreement in arguing that the forum selection clause gave this Court personal jurisdiction over him, and cannot now argue that the Agreement was invalid for purposes of recovering amounts paid to Mr. Pack. [Filing No. 96 at 6-7.] Further, he notes that rescission is only available if the status quo can be restored, and that, instead, "SBL would keep the benefits of Mr. Pack's labor (the funds from the successful loans), while Mr. Pack will be out the substantial time and effort he spent obtaining those loans for SBL." [Filing No. 96 at 7.]

The Agreement's non-competition provision states that:

During and after the Contractor's contract period with the Company, in the State of North Carolina, and for a period of 2 years following termination of employment,

however caused, the Contractor, or his/her Subcontractors, shall not seek or gain employment with any newly formed business (business formed after termination of this Agreement) that is in competition with the Company, its subsidiaries or affiliates within All States described as United States or within a (sic) All Businesses Within The United States mile radius of the Company and the aforementioned business location.

[Filing No. 1-1 at 23-24.]

SBL's claim that Mr. Pack has breached the non-competition provision of the Agreement fails for several reasons.  First, the non-competition provision prohibits Mr. Pack from engaging in competitive work in North Carolina.  [Filing No. 1-1 at 23-24.]  It is undisputed that Mr. Pack lives in South Carolina, and that the work that SBL claims violated the non-competition provision occurred in South Carolina.  For this reason alone, SBL's breach of contract claim based on the non-competition provision fails.

There are additional reasons, however.  The non-competition provision prohibits Mr. Pack from working at "any newly formed business (business formed after termination of this Agreement) that is in competition with the Company…."  [Filing No. 1-1 at 23-24.]  But by Ms. Green's own account, the website that SBL alleges Mr. Pack started was formed on June 25, 2018, and the two competing entities that SBL alleges Mr. Pack started were formed on July 3, 2018 and July 13, 2018.  [Filing No. 41-1 at 6.]  These dates are before July 24, 2018 – the date that SBL alleges the Agreement was terminated.  [Filing No. 1-1 at 9.]

Additionally, SBL must show that the non-competition provision protects a legitimate interest – that the provision is "reasonable and necessary in light of the circumstances" or, "in other words, the employer must demonstrate that the employee has gained a unique competitive advantage to harm the employer before such employer is entitled to the protection of a noncompetition agreement." *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 172-73 (Ind. Ct. App. 2008).  Here, after SBL gathered telephone numbers for potential customers and left

voicemails, independent contractors would contact the potential customers who had left their contact information and gather the required information from them, which Ms. Green would then pass on to potential lenders. The protectable interest here is the contact information for prospective borrowers, which undisputedly is not secret information and which is stale 30 to 60 days after it is obtained. The Court finds that this is not the type of information that is legitimately protectable under the non-competition provision in the Agreement.

Finally, SBL has not shown that it incurred any damages in connection with a breach of the non-competition provision in any event. SBL's suggestion that the Agreement should be rescinded and it should be reimbursed for the amount of commission Mr. Pack earned is puzzling. SBL has relied upon the Agreement throughout this litigation, arguing in response to Mr. Pack's Motion to Dismiss, for example, that the Agreement's forum selection clause provided this Court with personal jurisdiction over Mr. Pack. [Filing No. 22 at 1.] It cannot now argue that the Agreement should be rescinded. Further, rescission would be nonsensical. SBL cannot rely on rescission to argue that it suffered damages and is entitled to reimbursement, but at the same time argue that reimbursement is appropriate because Mr. Pack breached a term of the Agreement. Those two paths are inconsistent.

Because the non-competition provision applies only to Mr. Pack's employment in North Carolina, to employment with companies that were formed after the Agreement was terminated, and does not protect a legitimate interest, and since SBL has not shown that it incurred any damages in connection with a violation of the non-competition provision, the Court **GRANTS** Mr. Pack's Motion for Summary Judgment as it relates to SBL's breach of the Agreement's non-competition provision.

### 3. LinkedIn Misrepresentation and Recruitment of Zebulon Tuck

Mr. Pack argues in support of his Motion for Summary Judgment that mistakenly listing himself as an SBL employee on LinkedIn after he was terminated and attempting to recruit an SBL independent contractor, Zebulon Tuck, cannot form the basis of a breach of contract claim because SBL does not appear to be relying on those allegations and they occurred after termination of the Agreement. [Filing No. 81 at 9-10.] Mr. Pack also asserts that any breach did not cause SBL damages. [Filing No. 81 at 10.]

SBL does not address Mr. Pack's alleged misrepresentation on LinkedIn nor his alleged attempt to recruit Mr. Tuck in its response brief.

Because SBL does not respond to Mr. Pack's arguments regarding the LinkedIn allegation or the allegation relating to Mr. Tuck, the Court **GRANTS** Mr. Pack's Motion for Summary Judgment to the extent the breach of contract claim is based on those allegations. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument – as [SBL has] done here – results in waiver").

In sum SBL's breach of contract claim based on a failure to return the Lead Data and a violation of the non-competition provision fails as a matter of law, and SBL has waived any argument that allegations related to Mr. Pack's misrepresentation on LinkedIn or his recruitment of Mr. Tuck form the basis of a breach of contract claim. Therefore, the Court **GRANTS** Mr. Pack's Motion for Summary Judgment on SBL's breach of contract claim.

### B. Breach of Fiduciary Duty/ITSA

SBL alleges in connection with its breach of fiduciary duty/ITSA claim that while he was employed with SBL and immediately following termination, Mr. Pack pursued broker financing opportunities for his own benefit, including but not limited to working at Sprout Lending. [Filing

No. 1-1 at 14-15.]  SBL alleges that Mr. Pack "without SBL's consent, utilized SBL's property, equipment, and/or propriety (sic) trade secrets, consisting of proprietary data SBL obtained at great cost, for his own personal benefit, in violation of Indiana Law."  [Filing No. 1-1 at 15.]

In support of his Motion for Summary Judgment, Mr. Pack argues that SBL cannot show that a fiduciary relationship ever existed between the parties because Mr. Pack was an independent contractor, and the balance of power in the relationship favored SBL.  [Filing No. 81 at 10-11.] Mr. Pack contends that, even if a fiduciary relationship existed, SBL cannot show that it suffered any harm.  [Filing No. 81 at 11-12.]  He explains that the only two customers that SBL claims he did business with after he was terminated were Shaam and ILawn, and that SBL only seeks the commission that Mr. Pack was paid for those accounts – it does not seek any profit to Sprout Lending that SBL should have obtained.  [Filing No. 81 at 11-12.]  Mr. Pack asserts that "[g]iven that SBL always claims to pay commission to its representatives anyway,…SBL cannot show that it is any worse off today than it would have been if Mr. Pack had never worked with Sprout." [Filing No. 81 at 12.]  Mr. Pack argues that SBL has not identified any "trade secret" for purposes of its ITSA claim, or shown that Mr. Pack used any trade secrets for his personal gain.  [Filing No. 81 at 12-13.]  He also notes that the ITSA "is an improper vehicle to restrain competition."  [Filing No. 81 at 12 (citation and quotation omitted).]

In response, SBL argues that the parties "resolved the predominant issue on these claims when they agreed, in a stipulation initiated by Defendant's counsel, and upon follow-up questioning by Judge Stinson, in open court, that the destruction of the laptop used by Defendant while under contract with [SBL], would bring to a close the concerns relating to Defendant's possession, non-return, potential disclosure or use of data on the hard drive of the laptop…." [Filing No. 95 at 2.]  SBL argues that, despite the agreement, "Defendant, through counsel, has

refused to produce the laptop for the requisite pre-destruction verification, which is the only thing standing in the way of bringing numerous aspects of the instant matter to a close." [Filing No. 95 at 3.] SBL argues that, because there is no longer a controversy regarding these claims, it would be inappropriate for the Court to enter summary judgment and Mr. Pack's motion as to those claims is moot. [Filing No. 95 at 3-4.] SBL states that "the only thing preventing bringing this aspect of the case to a close is [Mr. Pack's] apparent roadblock to verification that the laptop was the one being used by [Mr. Pack] while he was with SBL, and his non-accessing the protectible SBL client data other than in his capacity as an SBL contractor." [Filing No. 95 at 3-4.]

In his reply brief, Mr. Pack argues that the continued existence of his laptop hard drive is irrelevant to the Motion for Summary Judgment, and that "SBL has been unwilling to consent to the destruction of the laptop without SBL first reviewing its contents…." [Filing No. 96 at 3.] Mr. Pack notes that he has "abandoned the laptop" to his counsel, who intends to destroy it, without copying its contents, at the end of this litigation. [Filing No. 96 at 4.]

Based on SBL's allegations in the Complaint, the Court reads SBL's claim as one for violation of the ITSA, rather than a common law breach of fiduciary duty claim. In any event, to the extent it also intends to assert a common law breach of fiduciary duty claim, that claim fails as a matter of law. "A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015) (citation and quotation omitted). SBL has not alleged, nor produced any evidence indicating, that it had a fiduciary relationship with Mr. Pack. Accordingly, a breach of fiduciary duty claim fails at the outset, and the Court **GRANTS** Mr. Pack's Motion for Summary Judgment to the extent that SBL intends to allege such a claim.

As for SBL's ITSA claim, the ITSA defines a "trade secret" as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind. Code § 24-2-3-2. A protectable trade secret is: "(1) information, (2) which derives independent economic value, (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy." *Bodemer v. Swanel Beverage, Inc.*, 884 F. Supp. 2d 717, 723 (N.D. Ind. 2012) (quoting *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 179 (Ind. Ct. App. 2007)). Whether customer information constitutes a trade secret "depends upon the facts of each individual case." *Harvest Life Ins. Co v. Getche*, 701 N.E.2d 871, 876 (Ind. Ct. App. 1998) (finding that a "policyholder list of an insurance company,… which can include names of customers, policy coverage, premium amounts, and expiration dates, is not a trade secret"); *see also U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.*, 826 N.E.2d 49, 64 (Ind. Ct. App. 2005) (holding that information in a surveyor database, some of which was "readily available over the Internet and through other sources in the public domain," and some "such as the surveyor ratings, client histories, and prospect response ratings, [which] are not readily available," was a trade secret under the ITSA); *N. Elec. Co. v. Torma*, 819 N.E.2d 417, 426 (Ind. Ct. App. 2004) (holding that information "already within the public domain" was a trade secret under the ITSA where an individual "invested considerable time and effort in the data compilation; specifically he stated that he gathered the data over a period of more than seven years and devoted at least 1,892 hours to organizing the data").

In opposition to Mr. Pack's Motion for Summary Judgment on the ITSA claim, SBL focuses solely on the parties' agreement that Mr. Pack's laptop hard drive would be destroyed. It does not attempt to show that the information on the laptop hard drive, or information Mr. Pack otherwise had, constituted trade secrets. In fact, evidence presented at the hearing on SBL's Motion for Preliminary Injunction showed that most of the information SBL objects to Mr. Pack having was telephone numbers. Although customer lists, which may include contact information, can constitute trade secrets under certain circumstances, *see, e.g.*, *Bodemer*, 884 F. Supp. 2d at 724-25, the Court finds that the information that is the subject of SBL's ITSA claim in this case does not. Notably, the telephone numbers of prospective borrowers may be purchased on a non-exclusive basis, and go "stale" after 30 to 60 days of purchase – a time that has long since passed in this case. Additionally, to the extent that SBL bases its ITSA claim on the script that was used to contact prospective borrowers, the Court finds that the script also does not constitute a trade secret because the information in the script is necessarily disclosed to prospective borrowers. *See Harvest Life*, 701 N.E.2d at 876 (policyholder lists are not trade secrets where "the information could be obtained from the policyholder himself, from the policy, or from other materials provided to the policyholder by the insurance company").

Because SBL has not identified any protectable trade secrets, Mr. Pack is entitled to summary judgment on its ITSA claim. The Court acknowledges that the parties agreed at the evidentiary hearing on SBL's Motion for Preliminary Injunction that Mr. Pack's laptop hard drive would be destroyed. [Filing No. 61 at 2-3.] Accordingly, the Court **ORDERS** that Mr. Pack's counsel shall effectuate destruction of the laptop hard drive by **May 6, 2020**, and shall file a Report with the Court within **5 days** of such destruction indicating that the hard drive was destroyed, and that the hard drive corresponded with the laptop that Mr. Pack used while employed by SBL.

### C. Unjust Enrichment

In connection with its unjust enrichment claim, SBL alleges that Mr. Pack was unjustly enriched by his unlawful conduct, and that SBL is entitled to "the ill-gotten gains, including without limitation all compensation or consideration received by [Mr.] Pack from SBL, the value of the proprietary data SBL provided to [Mr.] Pack, [and] the compensation or consideration [Mr.] Pack received for the Broker Financing services he provided between April 3, 2018 to the conclusion of this action, whether for his own personal benefit, or for the benefit of others…." [Filing No. 1-1 at 16.]

Mr. Pack argues in support of his Motion for Summary Judgment that an unjust enrichment claim fails where a contract governed the relationship and there is an adequate remedy at law. [Filing No. 81 at 13-14.]

SBL does not address its unjust enrichment claim in its response to the Motion for Summary Judgment.

Because SBL has not responded to Mr. Pack's arguments, it has waived any argument it may have in opposition to Mr. Pack's Motion for Summary Judgment on the unjust enrichment claim. *Bonte*, 624 F.3d at 466. In any event, Indiana courts have held that "[t]he existence of an express contract precludes a claim for unjust enrichment because: (1) a contract provides a remedy at law; and (2) as a remnant of chancery procedure, a plaintiff may not pursue an equitable remedy when there is a remedy at law." *Coppolillo v. Cort*, 947 N.E.2d 994, 998 (Ind. Ct. App. 2011) (citing *King v. Terry*, 805 N.E.2d 397, 400 (Ind. Ct. App. 2004)). Here, the Agreement provided SBL with the opportunity for a remedy at law. The Court **GRANTS** Mr. Pack's Motion for Summary Judgment on SBL's unjust enrichment claim.

**D.  Permanent Injunction**

Mr. Pack argues in support of his Motion for Summary Judgment that "[e]ven if one count survived for trial, SBL cannot show now that it lacks an adequate remedy at law any more than it could in connection with the denied motion for preliminary injunction." [Filing No. 81 at 4.]

In response, SBL focuses again on the parties' agreement related to destruction of Mr. Pack's laptop hard drive. [Filing No. 95 at 2-4.]

Mr. Pack argues in his reply that SBL has not responded to its argument regarding the request for a permanent injunction.

Because all of SBL's substantive claims fail as a matter of law as discussed above, SBL is not entitled to a permanent injunction and Mr. Pack's Motion for Summary Judgment is **GRANTED** as to that claim.

**IV.**
**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Mr. Pack's Motion for Summary Judgment, [80].  The Court **ORDERS** that Mr. Pack's counsel shall effectuate destruction of the laptop hard drive by **May 6, 2020**, and shall file a Report with the Court within **5 days** of such destruction indicating that the hard drive was destroyed, and that the hard drive corresponded with the laptop that Mr. Pack used while employed by SBL.  Final judgment shall enter accordingly.

Date: 4/8/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**